**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
*December 01, 2020*
David J. Bradley, Clerk of Court

| | |
|---|---|
| IN RE APPLICATION OF THE )<br>UNITED STATES OF AMERICA FOR )<br>AN ORDER PURSUANT TO 18 U.S.C. § )<br>2703(d) email account )<br>momok2004@aol.com )<br>) | Case No. __ **4:20mj2419**<br><br>**Filed Under Seal** |

## APPLICATION OF THE UNITED STATES
## FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Oath Inc. (AOL), an email service provider headquartered in Dulles, VA, to disclose certain records and other information pertaining to the email account momok2004@aol.com; as described in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

### LEGAL BACKGROUND

1. Oath Inc. (AOL) is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require Oath Inc. (AOL) to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically,

the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

4. The United States is investigating a pharmacy fraud matter. The investigation concerns possible violations of, inter alia, 18 U.S.C. § 1349 Conspiracy to Commit Mail Fraud.

### Conspirators

5. Mohamed MOKBEL is a resident of Houston, Texas, and is the CEO of 4M Pharmaceuticals LLC, a Houston-based corporation. MOKBEL has run 4M Pharmaceuticals since 2015 to present. 4M is the parent company for several Houston area pharmacies that MOKBEL owns or controls. Some of these pharmacies include DISTINGUISHED PHARMACY and PRIMARY CARE PHARMACY.

6. Said Hakim NEFIL owned and operated NORTHWEST AUTO LEASING d/b/a NORTHWEST DISTRIBUTOR ADVISORS in Portland, OR, from 2015 until 2017.

7. Dennis DIAO owns and operates DIAO, INC. in Los Angeles, CA.

**Diabetic Test Strip Conspiracy: 2015 to 2016**

8. According to reports from law enforcement, namely United States Immigration and Customs Enforcement - Homeland Security Investigations division (H.S.I.), MOKBEL, NEFIL, DIAO, and other individuals, from 2015 to 2016, engaged in a conspiracy to create counterfeit diabetic test strip packaging.

9. Diabetic test strip manufacturers create several versions of their products, both for domestic and international use, as well as retail versions intended to be used at local pharmacies, and mail order versions to be dispensed by mail order pharmacies. Each version is labeled and priced accordingly.

10. Insurance plans often cover diabetic supplies. These plans, managed by pharmacy benefit managers (PBMs), enter into agreements with pharmacies which set a number of rules and conditions. One of those rules is to truthfully bill for products dispensed. Another rule limits the kinds of operations pharmacies can engage in. For example, retail pharmacies are not permitted to have mail order operations, and thus, cannot sell mail order versions of products.

11. MOKBEL funded and lead the conspiracy, which involved purchasing "not for retail sale" mail-order diabetic testing strips and directed NEFIL and others to repackage them into counterfeit retail boxes.

12. Pharmacies buying diabetic test strips from authorized resellers can acquire mail order diabetic test strips for a fraction of the price of retail diabetic test strips. PBMs know this, and as a result, pay more for retail diabetic test strips.

13. MOKBEL and NEFIL agreed to acquire mail order test strips at a lower price, repackage them in counterfeit retail boxes, without the diabetic test strip manufacturers consent, and dispense them and bill the PBMs for a higher price.

14. H.S.I agents believe MOKBEL intended to, and likely did, sell mail order strips but bill them as retail strips. This primarily harmed insurance plans who paid more for a product as a result of deception. By selling cheaper mail order diabetic strips at retail diabetic strip prices, MOKBEL would increase his pharmacy profit margins.

15. Furthermore, MOKBEL, who registered his pharmacies as retail operations through the PBMs, was not permitted to dispense mail order strips under his contract. MOKBEL was also not allowed to mail these test strips to customers, but billing records show most of his customer patients lived out of state and interviews of those patients show they received their products by mail.

16. MOKBEL and NEFIL used the mail to run the business. MOKBEL and NEFIL sent checks to their diabetic test supplier in Florida. The Florida supplier shipped the mail-order testing strips to co-conspirators, including DIAO in California.

17. It is believed DIAO was key to the diabetic test strip repackaging operation. DIAO furthered the conspiracy by importing counterfeit box manufacturing equipment and materials from China, which MOKBEL paid for. DIAO received the mail-order diabetic test strips from the Florida supplier, removed them from their original manufacturer packaging, and then repackaged the diabetic test strip vial into the newly created counterfeit retail boxes.

18. H.S.I. obtained examples of these counterfeit retail boxes and have confirmed with Roche, the manufacturer of diabetic test strips, that the retail packaging is in fact counterfeit, and that the contents appear to be genuine mail order diabetic strips.

19. The repackaged diabetic testing strips were then shipped to NEFIL, who then shipped the products by FedEx to DISTINGUISHED PHARMACY and/or other MOKBEL-related pharmacies for dispensation to unsuspecting pharmacy customers.

20. MOKBEL used the mail to send money to compensate NEFIL for his efforts.

21. In 2017, PBMs opened audits into MOKBEL's pharmacies. They found discrepancies in the pharmacy operations, including in their dispensing of diabetic test strips. DISTINGUISHED PHARMACY was unable to provide invoices for all the diabetic test strips they billed to the prescription drug plans. The inventory discrepancy suggests MOKBEL dispensed the counterfeit packaged diabetic strips because neither NEFIL nor DIAO were authorized resellers of diabetic strips, and any invoices produced by them would not satisfy the audit. As a result of the audits, MOKBEL was required to refund several hundreds of thousands of dollars to the insurance plans.

## Second Conspiracy: 2016 to present

22. Since that time, 4M Pharmaceuticals LLC, from at least 2016 to present, has expanded in the number of pharmacies operated, as well as the products dispensed, which now include supplements and topical creams.

23. Several of these pharmacies are the subject of pharmacy board investigations and PBM audits for dispensing prescription drugs without prescriptions, dispensing drugs without patient consent, and violating PBM contracts prohibiting mail order operations.

24. Many of these complainants are Medicare beneficiaries and as a result, Health and Human Services – Office of Inspector General (HHS-OIG) has been engaged in a criminal investigation that continues to this day.

## Use of Email

25. NEFIL has provided a statement to investigators regarding his involvement with MOKBEL. NEFIL states he and MOKBEL communicated by email through the email address momok2004@aol.com.

26. Emails obtained from audits and other sources, including grand jury subpoenas, show MOKBEL has continually used the email address momok2004@aol.com from 2015 to 2020 as a point of contact for personal and business correspondence.

27. As recently as September 4, 2020, MOKBEL used momok2004@aol.com to create a new bank account for the 4M Pharmaceuticals LLC.

28. It is believed the subscriber and transaction records obtained through this order will help confirm which devices MOKBEL uses to access the account, confirm who has access to his email, who he communicates with, and whether the account is still currently being used to operate the criminal activities.

## REQUEST FOR ORDER

29. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Oath Inc. (AOL) be directed to produce all items described in Part II of Attachment A to the proposed Order.

30. The United States further requests that the Order require Oath Inc. (AOL) not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order for a time period of **180 days**. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify

any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order would be appropriate because the attached court order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the attached court order will seriously jeopardize the investigation or unduly delay a trial, including by giving targets an opportunity to flee or continue flight from prosecution and destroy or tamper with evidence.

31. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Ryan Patrick
UNITED STATES ATTORNEY


/s/ Abdul Farukhi
_____

Abdul Farukhi
Special Assistant United States Attorney
United States Attorney's Office – Houston
713-567-9000